UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CALVIN L. TIDSWELL, | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 90-63-P-C |
| | ) | Civil No. 05-115-P-S |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |

## **RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION**

Calvin Tidswell filed a 28 U.S.C. § 2255 motion in 2005, challenging his 2004 probation revocation and sentence.[1] One of Tidswell's claims in the motion was that his attorney was ineffective because he did not appeal the revocation judgment. With the United States' consent, Tidswell was allowed to appeal the revocation judgment and sentence. That appeal is now concluded and Tidswell has filed a renewed 28 U.S.C. § 2255 motion,[2] the United States filed a response, and Tidswell has filed a reply.[3] For the reasons that follow, I recommend that the court deny Tidswell habeas relief.

---

[1] Judge Carter presided over Tidswell's criminal proceedings.
[2] In my October 25, 2005, decision recommending the reinstatement of Tidswell's appeal, I was not sufficiently clear on the fate of Tidswell's five other 28 U.S.C. § 2255 claims. In its judgment on the reinstated appeal the First Circuit remarked:
> Although the judgment of the district court was concededly ambiguous, our interpretation is that a consideration of the merits, in regard to the claims other than that concerning reinstatement of the direct appeal, was implicit[l]y held in abeyance, as premature, pending disposition of the direct appeal. That appeal has now been concluded and appellant's return to the district court to pursue the claims held in abeyance will not constitute a second or successive § 2255 petition, but rather a completion of the first.

(Docket No. 25-3 at 2.)
[3] The United States has indicated, in response to Tidswell's reply to their response to his motion, that its memorandum (Docket No. 33) adequately addresses all of Tidswell's claims and that it will not respond to Tidswell's reply memorandum unless directed to do so by the Court. (See Docket No. 42.)

## DISCUSSION

### First Circuit's December 12, 2006, Judgment

On Tidswell's direct appeal, the First Circuit ruled:

> Appellant moved for relief under 28 U.S.C. § 2255 in the district court. He sought reinstatement of his right to appeal and made five other claims for collateral relief. Relief was granted insofar as appellant was permitted to appeal. On direct appeal of the sentence imposed in connection with appellant's conceded violation of the terms of his supervised release, we conclude that the record reflects that any challenge to the length of that sentence was waived in the district court. Moreover, appellant received a sentence within the statutory maximum. See 18 U.S.C. § 924.

(Docket No. 25-3 at 1-2.)

### Tidswell's Background Story

In his various 28 U.S.C. § 2255 pleadings Tidswell sets forth factual assertions pertaining to the revocation of his supervised release that he weaves into his five § 2255 grounds.

Tidswell claims, vis-à-vis the conduct that led to his revocation, that he was set up by the government's informant, Gordon E. Higgins:

> This case boils down to one thing. The MDEA Agents believed that they had a reliable informant in the form of Gordon E. Higgins, a convicted felon himself was on supervised release and had failed several urinalysis test and was in the Cumberland County Jail. The investigation was deeply flawed. After the Petitioner was arrested for an alleged sale of 1.3 grams of cocaine powder to the above named informant the investigating officers finally started an investigation. On April 8, 2004, two days after the Petitioner's arrest, the investigators found two witnesses, whom by their own admission worked for Gordon E. Higgins as cocaine distributors. They painted quite a different story of what Higgins had been selling.

(Reply Mem. at 3.) Tidswell claims that Higgins set him up with respect to the drugs and the gun so that Tidswell would be cleared from his turf. (Id. at 17.)

One of the two witnesses referenced here by Tidswell was apparently Dana Ingerson.  (Id. at 16.)  As proof that Ingerson exists, Tidswell cites to the first page of the written report by Agent Gerry Baril on his interview with Adam Plante in which Plante discusses Ingerson's (and Higgins's and Tidswell's) involvement in the use and distribution of cocaine.  (Id. & Ex. B.)    This exhibit is apparently a response to the United States' observation that Tidswell never identified the two suspects that had given the authorities information that would support his assertion that he was framed by Higgins.  (See Gov't Mem. at 29.)  "Ingerson, the mysterious interviewee, that the government claims never existed is now on their very own discovery material in black and white.  What else is the government hiding?"  (Reply Mem. at 16.)[4]

Tidswell also insists that Higgins gave the authorities conflicting statements about a vehicle and the status of Tidswell's driver's license.  (Id. at 22.)  The statement by Higgins that Tidswell focuses on is:  "Since Tidswell lived in Livermore, and had no drivers license, and no job, Higgins gave him rides to Portland, until Tidswell moved to Auburn, got his license, and purchased a truck for his own transportation."  (Id. at 23.)  Tidswell maintains that he has proof of the falsity of these statements.  He cites to the fact that Tidswell's mother assisted him in getting a vehicle prior to Tidswell's departure from the halfway house (id. & Ex. G) and represents – without record support  -- that he got his driver's license back on October 17, 2002, prior to leaving the halfway house (id.).[5]

---

[4]   Tidswell claims that Ingerson contacted his attorney "on several occasions" and offered to provide an affidavit but that Tidswell's attorney told Tidswell not to worry because of the pending proffer.  (Id. at 17.)

[5]   Tidswell also cites to a document memorializing the sale of his car to Higgins on July 20, 2003.  (Id. & Ex. H.)  It is unclear to me how this is at all relevant to his claim that the quoted statement by Higgins was blatantly false.

3

With respect to the conduct underlying Tidswell's revocation, Tidswell insists that he did not in fact sell the drugs, rather he just delivered 1.3 grams of cocaine when Higgins called his employee, Adam Plante, and told Plante to give the cocaine to Tidswell to bring to Higgins. (Reply Mem. at 6, 8, 35.) All that Tidswell admitted to was that Higgins had called him and asked him to bring a gram and a half from Higgins's employee. (Id. at 36.) Tidswell was surprised when, after this delivery, Higgins threw $140 onto the console of his truck. (Reply Mem. at 6, 35.) Tidswell concedes that he admitted to the agents that he had brought Higgins the gram per his request but urges that he did not admit to a sale. (Id. at 10.) As for the tape recording of that drug transaction, Tidswell finds it significant that it took the agents nine hours to decide that the tape recording provided sufficient evidence of a sale to justify his arrest. (Id. at 6-9.)

Tidswell further asserts that the evidence of the drug trafficking was found in the basement -- open to anyone -- of a three family dwelling in a neatly packed box owned by Higgins. (Reply Mem. at 4, 9-10, 35.) He stresses that the basement had a lock on the door which had recently been forcibly removed prior to the time that the agents arrived to search the premises. (Id. at 4.)

Tidswell maintains that he was a good candidate for severance from his supervised release because he never failed a urinalysis test during his incarceration even though there is a "vast amount of drugs in the Federal Bureau of Prison." (Reply Mem. at 20.) Probation terminated his urinalysis testing after 30 plus tests and after 15 months of supervised release. (Id. at 20-21 & Ex. D.) And his supervising probation officer wished him good luck on a copy of a letter written on Tidswell's behalf to a career center. (Id. at 21 & Ex. E.) Furthermore, his probation officer sent him a sympathetic letter after

4

Tidswell's re-incarceration, demonstrating that the officer bore no ill will and would be receptive to assisting Tidswell.  (Id. at 21 & Ex. F.)

Tidswell's 28 U.S.C. § 2255 claims also revolve around his contention that he partook in a proffer after his sentencing and was promised a reduction in his sentence for his cooperation. As for the promised proffer Tidswell, responding to the United States' contention that no proffer session was ever held, insists that the proffer meeting did in fact take place on June 24, 2004.  (Reply Mem. at 18-20, 31-34.)  He explains his silence at the June 21, 2004, sentencing on this issue by indicating that he could not possibly stand up and state that he had been promised a proffer meeting related to the possibility of testifying against the informant and suggest that the whole import of the sentencing would have been thereby undercut.  (Id. at 32-33; see also id. at 11.)   He was "simply walking through this sentencing knowing that the government was offering him a proffer meeting to gather facts about Higgins after it had deemed that he had lied repeatedly to agents."  (Id. at 12.)   He was,

> operating under a "contract" that he thought was full well going to be honored by the government.  Everything that happened at the sentencing, pre-conference and so forth should hold little weight in this matter.  A "breach of contract" occurred and the Petitioner since has been trying to rectify that matter through this court.
> ….
> This court is well aware that promises are not made in open court about forthcoming proffer meetings and so forth.

(Id. at 12.)

Tidswell represents that AUSA Jonathan Toof, his defense attorney, MDEA Agent Thomas Slivinski, Tidswell, and a person from "CMVCTF" were the five people present at the June 24, 2004, 9:00 a.m. proffer meeting.  (Id. at 18-19.)  A few months after the proffer meeting "that went extremely well," Tidswell laments that he was

5

informed by his attorney that the prosecutor in charge of his case had left government employ and that Tidswell would not be called back to testify against Higgins, or any one else. (Id. at 13.) AUSA Toof allegedly commenced the meeting by stating: "'Mr Tidswell, you will receive up to five years off of your sentence as a result of this proffer.'" (Id. at 19.) Tidswell believes that this formed a contract. (Id. at 19-20.) Tidswell further asserts that the meeting went so well Agent Silvinski gave Tidswell a ride back to the jail in his personal vehicle to spare Tidswell a wait in the holding pen. (Id. at 19.)

With respect to his violation of probation concerning correspondence with a federal inmate, Tidswell maintains that there was no correspondence in the preaddressed envelope. (Reply Mem. at 4.) As for his alleged violation of Condition 7, Tidswell argues that this condition forbade the excessive use of alcohol and all the Government found was a partial bottle of Captain Morgan Rum in the barn, a common area of the three-family building. (Id. at 4-5.)

*Tidswell's Five 28 U.S.C. § 2255 Claims*

**Tidswell's Two Ineffective Assistance of Counsel**

The First Circuit set forth the relevant touchstones for Tidswell's two ineffective assistance claims in United States v. Colon-Torres:

> The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." It is well settled that this right to effective assistance of counsel attaches at all critical stages of the trial, United States v. Wade, 388 U.S. 218 (1967), including at sentencing. Gardner v. Florida, 430 U.S. 349, 358 (1977) (holding that "sentencing is a critical stage of the criminal proceeding at which [defendant] is entitled to the effective assistance of counsel").
> The touchstone for any ineffective assistance of counsel claim is the two-part test laid down by the Supreme Court in Strickland v.

6

> Washington, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Id. at 687. In other words, defendant "must show that counsel's performance was so deficient that it prejudiced his defense." United States v. Ademaj, 170 F.3d 58, 64 (1st Cir.1999) (summarizing Strickland). As the Strickland Court explained, "[u]nless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
>
> In Hill v. Lockhart, 474 U.S. 52 (1985), the Supreme Court applied Strickland 's two-part test to ineffective assistance of counsel claims in the guilty plea context. Id. at 58 ("We hold, therefore, that the two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel."). As the Hill Court explained, "[i]n the context of guilty pleas, the first half of the Strickland v. Washington test is nothing more than a restatement of the standard of attorney competence already set forth in [other cases]. The second, or 'prejudice,' requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." Id. at 58-59.

382 F.3d 76, 85 -87 (1st Cir. 2004).

### Failing to object to the assertion that Tidswell violated Special Condition Number 3

Tidswell claims that his attorney was ineffective because he did not object to the assertion that he violated Special Condition Number 3. Special Condition Number 3 provided: "The defendant shall not commit any crimes, federal, state or local, during the period of his supervised release." Tidswell relies on the fact that he was never found guilty of the state charge of trafficking in a controlled substance and that counsel should not have allowed Tidswell to concede the violation in the federal revocation. ( Mot. Revisit at 2.) He opines: "A well trained lawyer would have covered all of his or her bases. Keep in mind that defense counsel knew from the beginning that the discovery

7

material contained perjured testimony" and he should have taken steps to protect Tidswell beyond securing a promise that the state case would be dismissed and that, apropos the federal exposure, that Tidswell's proffer/testimony would lead to a drastic reduction in his sentence. (Reply Mem. at 26.)

Not much more needs to be added to the United States' response to this ground, which is:

> Tidswell's Ground Two fails both parts of the Strickland test because the language of Special Condition #3 did not require him to avoid being convicted of any offense. Instead, Special Condition #3 read "Defendant shall not commit any crimes, federal, state, or local, during the period of his supervised release" (emphasis added). That requirement was consistent with U.S.S.G. §7B1.1, comment. (n.1), which explains that pursuant to 18 U.S.C. §3653(a)(1) and 3583(d), a requirement that a defendant not commit another crime is a mandatory condition of supervised release. That same application note makes clear that "[a] violation of this condition may be charged whether or not the defendant has been the subject of a separate federal, state, or local prosecution for such conduct." USSG §7B1.1, comment. (n.1). Thus, a conviction was not necessary for supervised release to be revoked. See United States v. Correa-Torres, 326 F.3d 18, 20 (1st Cir. 2003). All that was required was evidence that Tidswell committed a new crime. See id.
> As the revocation report showed, Tidswell indeed committed a crime on April 6, 2004, when he sold cocaine during a controlled purchase that was witnessed by drug agents. Because reasonable counsel would have known that Tidswell could be found to have violated the terms of supervision whether or not he was convicted of this new crime, he neither performed deficiently in permitting Tidswell to admit to the violation nor was Tidswell prejudiced as a result. See Strickland, 466 U.S. at 687.

(Gov't Mem. at 21-22.)

I add, in view of Tidswell's assertion that he did not expect to receive any money for his delivery of the cocaine, that under Maine Law the conduct that Tidswell still concedes to would meet the definition of furnishing illegal drugs under 17-A M.R.S.A. § 1106, proscribing the unlawful furnishing of scheduled drugs, and § 1101(18), which defines "Furnish": "To furnish, give, dispense, administer, prescribe, deliver or otherwise

8

transfer to another."  Tidswell admits that the substance he delivered to Higgins was cocaine, a Schedule W substance, see 17-A M.R.S.A. § 1102, which is a Class C offense under Maine Law, see id. § 1106(1-A)(A), and, thus, punishable by up to five years imprisonment, see id. §1252(2)(C), and which qualifies as a Grade A violation under U.S.S.G § 7B1.1(a)(1).[6]

### Failure to assert that the application of U.S.S.G. § 7B1.2 was impermissible under the Ex Po Facto clause

"History teaches that the Ex Post Facto Clauses, U.S. Const. art. 1, § 9, cl. 3, and art. 1, § 10, cl. 1, should be construed narrowly." Libby v. Magnusson, 177 F.3d 43, 46 (1st Cir. 1999)(citing Collins v. Youngblood, 497 U.S. 37, 41-52 (1990)). "Thus, an ex post facto law is one that punishes, as a crime, an act which was innocent when committed; or which, after a crime has been perpetrated, changes the punishment and renders it more onerous; or which strips away a defense that was available at the time when the defendant committed the crime."  Id. (citing Lynce v. Mathis, 519 U.S. 433, 440-41 (1997), California Dep't of Corrections v. Morales, 514 U.S. 499, 504-06 & n. 3 (1995), Beazell v. Ohio, 269 U.S. 167, 169-70 (1925), and Hamm v. Latessa, 72 F.3d 947, 956-57 (1st Cir.1995)).

Tidswell maintains that he should not have been subjected to U.S.S.G,.§ 7B1.2 in his 2004 revocation because that provision was not in effect in 1991, when his conditions of supervised release were set.  (Sec. 2255 Mot. at 4-5.)  He complains that he received a statutory maximum under a scheme that was not in place at the time of the original arrest.  (Reply Mem. at 27.)  He believes that under the previous guideline maximum exposure would have been twenty months.  (Id. at 28.)  "The government," Tidswell maintains,

---

[6]  This is not to mention the other three grounds for revocation.

9

cannot "possibly claim that the ex post facto claim is irrelevant and assume that an appellate court would simply brush it away. This area of the government's motion is absurd." (Id.)

The revision in the United States Sentencing Guideline that Tidswell finds objectionable is the creation of a revocation table that sets forth a range of months based on the grade of violation. The conduct that gave rise to the revocation of Tidswell's sentence occurred well after the revisions to the guideline. Furthermore, as the United States points out, Tidswell presented his ex post facto argument to the First Circuit in his reinstated appeal. (See Substitute Mot. Summ. Affirmance at 16, Docket No. 42.) The United States argued there, as it does here, that the maximum term of supervised release was established not by the guideline policy statement but by statute and that there was agreement that both before 1991 and afterward, 18 U.S.C. § 3583(e)(3) limited Tidswell's term of imprisonment for violation of his supervised release to 60 months. See United States v. Work, 409 F.3d 484, 491 (1st Cir. 2005.) The First Circuit's summary affirmance is evidence that it found no plain error apropos this ground and counsel's performance in not raising this challenge cannot be said to fall below the Strickland standard for performance.

### Non-Ineffective Assistance Claims

All of Tidswell remaining claims are subject to summary dismissal because they were claims that could have and should have been raised on his direct appeal. In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. United States v. Frady, 456 U.S. 152, 166 (1982).

10

Tidswell had pled all of his remaining claims in his pre-appeal 28 U.S.C. § 2255 motion. When his direct appeal was reinstated he was cautioned:

> Tidswell's appeal from the revocation order previously challenged has been reinstated and counsel has been assigned to handle that appeal. It is now pending in the First Circuit Court of Appeals. It will be up to counsel and Tidswell to determine which of the remaining grounds of this motion can or should be raised on direct appeal. No further relief will be provided by this court in this case.

(Docket No. 19.) To the extent that he pressed any of these non-ineffective assistance claims in any guise before the First Circuit they have been decided against him and he cannot revive them in this 28 U.S.C. § 2255 proceeding. See DuPont v. United States, 76 F.3d 108, 110-11 (6th Cir.1996). To the extent that he did not raise a claim that could have and should have been raised in that appeal, they are also not properly raised in this proceeding, particularly in the context of Tidswell's procedural history. A petitioner is procedurally barred from raising claims in a § 2255 motion, even those of constitutional magnitude, to which no contemporaneous objection was made and/or which were not presented on direct appeal. Bousley v. United States, 523 U.S. 614, 622 (1998); Frady, 456 U.S. at 167-68; Singleton v. United States, 26 F.3d 233, 236 (1st Cir. 1994). Tidswell nowhere attempts to demonstrate cause and prejudice for his failure to raise these grounds on direct appeal nor does he demonstrate actual innocence/that there has been a miscarriage of justice. See Bousley, 523 U.A. at 622; Frady, 456 U.S. at 167-68. Putting aside their fatal flaw, I briefly discuss the substantive problems with these grounds below.

### Probation officer's failure to inform Tidswell that he could apply for severance from his supervised release

One of Tidswell's 28 U.S.C. § 2255 grounds attacks the performance of his supervising probation officer, arguing that the officer should have informed him that he could have applied for severance from his supervised release. (Sec. 2255 Mot. at 5.) He alleges that he was told that he could not make such an application until three years had elapsed, rather than the one-year required by the statute. (Id.)

In response to the United States' argument that a claim about advice from a probation officer is not a cognizable 28 U.S.C. § 2255 claim, Tidswell opines: "The Petitioner merely states here that a United States Probation Officer is an Officer of the Court. In being such, he should be held accountable for his actions, his statements, his promises, and so forth." (Reply Mem. at 29.) He assaults the Government's argument that he would not have been a good candidate for severance citing to exhibits showing that his routine urinalysis was discontinued and his probation officer went out of his way to help him and wish him luck. (Id. & Exs. D,E, & F.)

Section 2255, of title 28 provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C.A. § 2255 ¶ 1. This claim concerning the advice or lack thereof received from a supervising probation officer concerning eligibility for severance does not fall within the ambit of 28 U.S.C. § 2255.

**Plea to the supervised release violation was unlawfully induced and not voluntary and knowing**

Tidswell maintains that his plea to the violation of the terms of his supervised release was unlawfully induced and not voluntary and knowing because he was lead to believe that his plea of guilty on June 21, 2004, would lead to the June 24, 2004, proffer, which in turn would lead to a reduction in his sentence. (Sec. 2255 Mot. at 5-A.)

In response to the Government's assertion that no proffer meeting occurred, Tidswell argues: "The government[']s attorney ought to be ashamed for attempting to deceive this court" in that it knows full well who made the promise to Tidswell. (Reply Mem. at 31.) He asks the Court to subpoena the individuals he has identified as attending that meeting to see whether he or the government is correct. (Id. at 32.) With respect to the Government's assertion that Tidswell's representations to the Court at the revocation are evidence that there was no proffer in the works, Tidswell opines the "it is known by the court … that one does not stand up in court and state: 'Your Honor, the only thing that I've been promised is a proffer meeting to testify against an informant that the MDEA has been using, so why are we here anyway, this is all going to go away in a few months anyway!'" (Id. at 32-33.) Tidswell states that he had no control over AUSA Toof's decision to leave government service and that, given the breach of his contract apropos the proffer and testimony, this 28 U.S.C. § 2255 motion is a proper mechanism to raise this claim. (Id. at 34.)

At his revocation hearing Tidswell made it clear to the court that he was admitting the violations. (June 21, 2004, Tr. at 10-11.) During the sentencing portion of the revocation proceeding, AUSA Toof told the court that the maximum sentence that could be imposed was 60 months imprisonment and that that was the sentence that the Government sought. (Id. at 15.) He explained, "this was a Class A, the defendant has a

13

serious criminal history and there is nothing that I think of that would call for a sentence of any less that that."  (Id.)  Defense counsel took "no position on the government's recommendation for practical effect" aside from staying interest on the fine.  (Id. at 15-16.)  Tidswell was given the opportunity to say anything he wished and he declined.  (Id. at 16.)  Tidswell cannot now get habeas relief apropos his revocation judgment by alleging that he had an undisclosed agreement with the AUSA to testify against Higgins. See United States v. Butt, 731 F.2d 75, 80 (1st Cir. 1984).

Even if an evidentiary hearing were convened and the court ultimately concluded that such a "proffer" meeting did occur on June 24, 2004, I am not sure how that fact would negate Tidswell's admission to the revocation charges.  At best, Tidswell's allegations, if proven, would show that he admitted the revocation violation with the hope that the Government would allow him to testify against Higgins at some future proceeding.  The "contract" he describes, by his own information, was in the formative phase.  Assuming the Government, for whatever reason, determined that nothing Tidswell had to say was of any interest to them, I do not see how that fact can be viewed as a "breach of contract" that would give rise to vacating the revocation sentence. Tidswell may have believed or hoped that his 60 month sentence was going to be drastically reduced after his cooperation became apparent, but nothing he has submitted suggests he was promised any such eventuality.  Assuming the "proffer" meeting did occur after the sentencing, nothing ever came of it and certainly no "contract" was ever formed based upon Tidswell's own submissions.

**Prosecution failed to disclose exculpatory information**

In his final 28 U.S.C. § 2255 ground, Tidswell asserts that he did not receive discovery materials from the government even though the federal prosecutors had this material prior to his plea. (Sec. 2255 Mot. at 5-A.) Tidswell represents that the discovery materials in question consisted of more than 100 pages and included "extensive evidence favorable to the defendant." (Id.) It was not until the state case was ultimately dismissed that he received this information from the State. ( Id.) He stresses that he never admitted in a warned statement that he distributed drugs, he only admitted that Higgins had called him and asked him to bring him a gram and a half from Higgins's employee. (Reply Mem. at 36.) If the heart of this ground is that he could have proven that his conduct did not qualify as a sale, I have already explained that under Maine law his admitted conduct was sufficient to justify revocation of his term of supervised release.

Tidswell also cross-references his allegations concerning Higgins's efforts to plant a gun on Tidswell with the aim of clearing Tidswell from his turf. (Mot. Revisit at 6 -7.) "Surely," Tidswell opines, "a person on supervised release, dealing cocaine, trying to purchase handguns, possibly to set up an innocent victim has to be considered a crime, a very serious crime, and should have been revealed to the Petitioner." (Id. at 7.) [7] It is evident that Tidswell believes that the Government should have pursued this evidence against Higgins but this evidence is not exculpatory of Tidswell apropos the key conduct that led to his revocation.

### *Conclusion*

For the reasons set forth above, I recommend that the Court **DENY** Tidswell 28 U.S.C. § 2255 relief.

---

[7] Tidswell does not make it clear whether or not he believes the gun found in the search was a gun planted by Higgins. It is not a determinative issue, as the drug transaction is sufficient in itself to warrant revocation.

15

## NOTICE

  A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

  Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

July 6, 2007                 /s/Margaret J. Kravchuk
                       U.S. Magistrate Judge